BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
ALEX J. TRAMONTANO (276666)
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com

*Attorneys for Plaintiff*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MOHAMMED ABBAS, Derivatively on Behalf of Nominal Defendant ROCKET LAB USA, INC.,<br><br>Plaintiff,<br><br>v.<br><br>PETER BECK, ADAM SPICE, NINA ARMAGNO, EDWARD FRANK, MATT OCKO, JON A. OLSON, KENNETH POSSENRIEDE, MERLINE SAINTIL, and ALEX SLUSKY,<br><br>Defendants,<br><br>and<br><br>ROCKET LAB USA, INC.,<br><br>Nominal Defendant. | Case No. _______________<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Mohammed Abbas ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Rocket Lab USA, Inc. ("Rocket Lab" or the "Company"), against current and former members of the Company's Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breach of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, conference call transcripts and announcements made by Defendants, filings with the United States Securities and Exchange Commission ("SEC"), press releases published by and regarding Rocket Lab, legal filings, news reports, securities analysts' reports about the Company, filings in the securities class action captioned *Bray v. Rocket Lab USA, Inc., et al*, Case No. 2:25-cv-01733-GW-KES (C.D. Cal.) (the "Securities Class Action"), and other publicly available information.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought by Plaintiff on behalf of Rocket Lab against certain of its officers and members of the Company's Board (the "Individual Defendants")[1] for breaches of their fiduciary duties between at least November 12, 2024 and February 25, 2025, inclusive (the "Relevant Period"), and

---

[1] Individual Defendants are Peter Beck ("Beck"), Adam Spice ("Spice"), Nina Armagno ("Armagno"), Edward Frank ("Frank"), Matt Ocko ("Ocko"), Jon A. Olson ("Olson"), Kenneth Possenriede ("Possenriede"), Merline Saintil ("Saintil"), and Alex Slusky ("Slusky"). The Individual Defendants, together with Rocket Lab, are "Defendants."

violations of federal securities laws, as set forth below.

2. Headquartered in Long Beach, California, Rocket Lab is a purported end-to-end space company that delivers launch services, spacecraft design services, spacecraft components, spacecraft manufacturing and other spacecraft and on-orbit management solutions that make it faster, easier and more affordable to access space.

3. In 2017, the Company launched Electron, a fully carbon composite launch vehicle powered by Rutherford, the Company's electric turbopump 3D print engines.

4. On March 1, 2021, the Company announced that it was launching its newest rocket, Neutron, an advanced eight-ton payload class launch vehicle tailored for mega-constellation deployment, interplanetary missions and human spaceflight.[2] The Company highlighted Neutron, stating that it would "transform space access for satellite constellations and provide a dependable, high-flight-rate dedicated launch solution for larger commercial and government payloads."

5. In early 2024, the Company announced that it would conduct a test launch of Neutron in mid-2025 before offering three commercial launches in 2026 and five commercial launches in 2027. On November 12, 2024, Rocket Lab issued a press release announcing that the Company entered into a multi-launch agreement with a confidential commercial satellite constellation operator for Neutron and that the under the contract, Rocket Lab would launch two dedicated missions on Neutron starting in mid-2026.[3]

---

[2] Rocket Lab USA, Inc., *Rocket Lab Unveils Plans for New 8-Ton Class Reusable Rocket for Mega-Constellation Deployment* (Mar. 1, 2021), https://www.rocketlabusa.com/updates/rocket-lab-unveils-plans-for-new-8-ton-class-reusable-rocket-for-mega-constellation-deployment/.

[3] Rocket Lab USA, Inc., *Rocket Lab Signs Multi-Launch Contract for Neutron with Confidential Commercial Satellite Constellation Operator* (Nov. 12, 2024), (footnote continued)

6. Throughout the Relevant Period, the Individual Defendants made numerous materially false and misleading statements related to the Company's Neutron launch, repeatedly touting that the Neutron launch was forthcoming and providing investors with no indication that there would be any delay in the launch.

7. For instance, at the start of the Relevant Period, on November 12, 2024, the Company issued a press release announcing its financial results for the third quarter of 2024 (the "3Q24 Earnings Release"). The 3Q24 Earnings Release highlighted the Company's "[s]ignificant achievements for the quarter," including "signing a launch service agreement for multiple launches on Neutron with a confidential commercial satellite constellation customer." The 3Q24 Earnings Release also reported that there was "continued progress across Neutron and space systems."

8. However, in reality, the Individual Defendants knew that the launch of Neutron would be delayed due to a myriad of issues.

9. The truth was revealed on February 25, 2025, when *Bleecker Street Research* published a report (the "Bleecker Street Report") claiming, among other things, that Rocket Lab "has materially misled investors about the likelihood that its Neutron rocket will launch in mid-2025."[4] Specifically, the Bleecker Street Report revealed, among other things, that: (i) Rocket Lab's plans for barge landing tests for the Neutron, which were originally scheduled to take place between September 2024 and March 2025, were delayed and would not take place until between September 2025 and March 2026; (ii) the Company was experiencing significant setbacks at the

---

https://www.rocketlabusa.com/updates/rocket-lab-signs-multi-launch-contract-for-neutron-with-confidential-commercial-satellite-constellation-operator/.

[4] Bleecker Street Research, *Rocket Lab (RKLB): We Think It's Gonna Be a Long, Long Time* (Feb. 25, 2025), https://www.bleeckerstreetresearch.com/research/rklb.

launch facility, located on Wallops Island in Virginia, including with the construction of the launch pad, engine and structure development, and production facilities, which would cause significant delays to the launch, including that the entire island had a potable water problem that would not be fixed until early 2026; and (iii) the sole Neutron contract announced by Rocket Lab seemed to be with "an unproven, questionably capitalized startup called E-Space."

10. On this news, Rocket Lab's stock price fell $2.21 per share, or nearly 10%, from a closing price of $22.49 per share on February 24, 2025, to a closing price of $20.28 per share on February 25, 2025.

11. As set forth herein, throughout the Relevant Period the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and/or misleading statements and omissions of material fact to the investing public concerning the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (i) the Company's initial plans for the Neutron's barge landing tests were substantially delayed; (ii) preparation of the launch pad for Neutron was delayed due to a myriad of issues, including the potable water issue on the island that would not be resolved until early 2026; (iii) due to these issues, it was extremely unlikely that the Neutron rocket would launch in mid-2025 as anticipated; (iv) Rocket Lab's sole contract for the Neutron launch was not as lucrative as the Company led investors to believe; and (v) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

12. Furthermore, as detailed herein, the Individual Defendants breached their fiduciary duties by willfully or recklessly caused the Company to fail to maintain adequate internal controls while five of the Individual Defendants engaged in improper insider sales during the Relevant Period, netting total proceeds of

approximately $6.4 million.

13. As a result of the foregoing, the Securities Class Action was filed against the Company and Defendants Beck and Spice on February 27, 2025, in the United States District Court for the Central District of California.

14. As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the cost of defending and paying class-wide damages in the Securities Class Action, as well as additional losses, including reputational harm and loss of goodwill.

15. Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Rocket Lab's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

17. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18. This action is not a collusive action designed to confer jurisdiction on a

court of the United States that it would not otherwise have.

19. In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

20. Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District, Rocket Lab is headquartered in this District, Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Securities Class Action is pending in this District.

## PARTIES

***Plaintiff***

21. Plaintiff is, and has been at all relevant times, a continuous shareholder of Rocket Lab.

***Nominal Defendant***

22. Nominal Defendant Rocket Lab is a Delaware corporation with its principal executive offices located at 3881 McGowen Street, Long Beach, California 90808. Rocket Lab's common stock is traded on the NASDAQ under the ticker symbol "RKLB."

***Individual Defendants***

23. Defendant Beck is the founder of the Company and has served as Chief Executive Officer ("CEO") and President of the Company since July 2013 and as Chairman of the Board since August 2021.

24. Defendant Spice has served as Chief Financial Officer of the Company since May 2018.

25. Defendant Armagno has served as a director of the Company since November 2023. Armagno also serves as Chair of the Company's Government Security Committee and as a member of the Company's Nominating and Corporate Governance Committee.

26. Defendant Frank has served as a director of the Company since September 2022. Frank also serves as Chair of the Company's Compensation committee and as a member of the Company's Audit Committee.

27. Defendant Ocko has served as a director of the Company since August 2021.

28. Defendant Olson has served as a director of the Company since August 2021. Olson also serves as Chair of the Company's Audit Committee and as a member of the Company's Nominating and Corporate Governance Committee.

29. Defendant Possenriede has served as a director of the Company since August 2024. Possenriede also serves as a member of the Company's Audit Committee and Compensation Committee.

30. Defendant Saintil has served as a director of the Company since June 2021. Saintil also serves as the Company's lead independent director, Chair of the Company's Nominating and Corporate Governance Committee, and a member of the Company's Compensation Committee.

31. Defendant Slusky has served as a director of the Company since August 2021.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

32. By reason of their positions as officers and/or directors of Rocket Lab, and because of their ability to control the business and corporate affairs of Rocket Lab, the Individual Defendants owed Rocket Lab and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Rocket Lab in a fair, just, honest, and

equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Rocket Lab and its shareholders.

33. Each director and officer of the Company owes to Rocket Lab and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

34. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Rocket Lab, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

35. To discharge their duties, the officers and directors of Rocket Lab were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

36. Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Rocket Lab, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

37. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products,

management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

38. To discharge their duties, the officers and directors of Rocket Lab were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Rocket Lab were required to, among other things:

(i) Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of California and the United States, and pursuant to Rocket Lab's own Code of Ethics and Employee Conduct (the "Code of Conduct");

(ii) Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii) Remain informed as to how Rocket Lab conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv) Establish and maintain systematic and accurate records and reports of the business and internal affairs of Rocket Lab and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said

reports and records;

(v) Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Rocket Lab's operations would comply with all applicable laws and Rocket Lab's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vi) Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii) Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(viii) Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

39. Each of the Individual Defendants further owed to Rocket Lab and the shareholders the duty of loyalty requiring that each favor Rocket Lab's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

40. At all times relevant hereto, the Individual Defendants were the agents of each other and of Rocket Lab and were at all times acting within the course and scope of such agency.

41. Because of their advisory, executive, managerial, and directorial positions with Rocket Lab, each of the Individual Defendants had access to adverse, non-public information about the Company.

42. The Individual Defendants, because of their positions of control and

authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Rocket Lab.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

43. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

44. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

45. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

46. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Rocket Lab, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

47. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each

Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

48. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Rocket Lab and at all times acted within the course and scope of such agency.

**ROCKET LAB'S CODE OF CONDUCT**

49. Rocket Lab's Code of Conduct applies to "all directors, officers, and employees of Rocket Lab and its subsidiaries."

50. The Code of Conduct begins with an "Overview of the Code," which states, in part, that "Rocket Lab's reputation for honesty and integrity is among our most important assets."

51. Under a section titled "Purposes of the Code," the Code of Conduct states that Rocket Lab adopted the Code of Conduct to:

> [D]eter wrongdoing and promote the following:
>
> - Honest and ethical conduct, including (i) the ethical handling of actual or apparent conflicts of interest between personal and professional relationships; (ii) the ethical conduct of our business; and (iii) the ethical management of our relationships and transactions with customers, vendors, and anyone with whom we conduct business;
>
> - Full, fair, accurate, timely, and understandable disclosure in reports and documents we file with, or submit to various

government agencies, and in other public communications we make;

- Compliance with applicable governmental laws, rules, and regulations;

- Prompt internal reporting of violations of the Code to an appropriate person or persons identified in the Code; and

- Accountability for adherence to the Code.

52. Under the section titled "Financial Records and Public Disclosure," the Code of Conduct states:

> Every Rocket Lab financial record – including sales records, time sheets, expense reports, books and ledgers, and other financial data and records – must be accurately and timely prepared and must be prepared in accordance with all applicable laws, principles, and standards. The integrity of our financial transactions and records is critical to the operation of our business and to maintaining the confidence and trust of our stockholders, customers, suppliers, and employees.
>
> *General Principles Applicable to Employees*
>
> Each employee having any responsibility for, or involvement in, financial reporting or accounting must have an appropriate understanding of relevant accounting and financial reporting principles, standards, laws,

rules, and regulations as well as Rocket Lab's financial and accounting policies, controls, and procedures.

Each employee having any responsibility for, or involvement in, the customer sales and support process or managing relationships with Rocket Lab's vendors must understand the accounting and financial reporting implications of Rocket Lab's transactions with these parties. All such employees should consult with the Finance Department to discuss any requests for non-standard terms or conditions. All such employees are responsible for ensuring the accuracy and completeness of all documentation relating to customer sales and support or vendor transactions. **The terms and conditions of any transaction between Rocket Lab and any customer or vendor must be fully and completely reflected in the documentation governing the transaction. The existence of oral or written agreements or understandings of any kind that are not part of the documentation relating to the transaction and that are not reported to the Finance Department as part of such transaction is an absolute violation of this Code and may constitute grounds for immediate termination of employment, consistent with applicable laws.** Examples of such agreements or understandings include (but are not limited to) requests for payment terms that differ from those reflected in purchase orders or other documentation or rights to return or cancel orders or products that are not reflected in the documentation. **Employees involved in customer and vendor transactions are responsible for consulting with the Finance Department if any customer or vendor requests that Rocket Lab consent to any term or condition that would not be fully reflected in**

**the documentation relating to the transaction.**

Even employees not directly involved in financial reporting, accounting, sales or purchasing will likely come into contact with financial records or reports or with other documents on which employees preparing financial statements will depend. These may include vouchers, time sheets, invoices, or expense reports. We expect every employee, regardless of familiarity or involvement with finance or accounting matters or principal job responsibilities or functions, to use all reasonable efforts to ensure that every business record or report with which the employee deals is accurate, complete, reliable, and timely submitted.

Each employee is specifically required to use all reasonable efforts to ensure the following provisions of the Code are satisfied:

- All transactions must be recorded and classified in the proper accounting period and in the appropriate account and department. Delaying or prepaying invoices to meet budget goals is a violation of the Code.

- No employee may falsify any document or distort the true nature of any transaction.

- All transactions must be supported by complete and accurate documentation.

- Any information or statement in any report, filing, certification,

application, or similar document that Rocket Lab may submit to any governmental authority or entity must be full, fair, accurate, timely, understandable, and complete.

- Employees must cooperate fully with any investigation into the accuracy, completeness, and timeliness of Rocket Lab's financial records.

- To the extent estimates and accruals are required to be made in Rocket Lab's reports and records, employees involved with such estimates and accruals will base them on good faith judgments supported by appropriate documentation.

- No payment may be made to any supplier, vendor, or other person, other than the person or firm that actually provided goods or services to Rocket Lab, unless the payment is approved in advance by the Compliance Officer. . . .

*Public Communications and Reports*

Rocket Lab files reports and other documents with governmental and regulatory agencies. In addition, from time to time, Rocket Lab makes other public announcements, such as issuing press releases.

Employees involved in the preparation of these reports, documents, or announcements are expected to use all reasonable efforts to ensure that Rocket Lab's disclosures are complete, accurate, objective,

relevant, timely and understandable. In addition, employees are expected to comply with Rocket Lab's disclosure controls and procedures, which are designed to ensure full, fair, accurate, timely and understandable disclosure in our public reports and communications.

If an employee believes that any public disclosure by Rocket Lab is materially false or misleading, if any employee becomes aware of material information that the employee believes should be disclosed to the public, or if any employee believes that questionable accounting or auditing conduct or practices have occurred or are occurring, the employee should follow the reporting procedures in Section III (Accountability and Reporting).

*Intentional Misconduct*

Intentional misrepresentations of the Company's financial performance or any other action by an employee that intentionally compromises the integrity of Rocket Lab's reports (financial or otherwise), records, or public disclosures is a specific and extremely severe violation of this Code. Any violation of this Code arising from an intentional misrepresentation, including failure to report potential misrepresentations by others, will be viewed as severe misconduct and will be subject to severe penalties, which may include termination of employment, consistent with applicable laws. Examples of such intentional misconduct would include, but are not limited to, the following:

- Reporting any information or entering any information in Rocket Lab's books, records, or reports that fraudulently or intentionally hides, misrepresents, or disguises the true nature of any financial or non-financial transaction;

- Agreeing orally or in writing to any term or condition of any transaction with a customer or vendor that is not reflected in the documentation provided to the Finance Department or failing to disclose to the Finance Department that any customer or vendor either intends to breach or otherwise fail to honor any term or condition as reflected in such documentation or has an understanding of any term or condition that is inconsistent with the understanding of the Company and the Finance Department;

- Establishing any undisclosed or unrecorded fund, account, asset, or liability for any purpose;

- Entering into any transaction or agreement that accelerates, postpones, or otherwise manipulates the accurate and timely reporting of revenues and expenses;

- Intentionally misclassifying transactions as to accounts, business units, or accounting periods;

- Intentionally destroying or altering any document or record that

the employee has been notified is subject to a legal hold; or

- Knowingly assisting others in any of the above.

53. Under the section titled "Compliance with Laws, Rules, and Regulations," the Code of Conduct states, in pertinent part:

> Employees and directors must comply with all laws, rules and regulations applicable to the Company and its business, as well as applicable Company policies and procedures. Each employee and director must acquire appropriate knowledge of the legal requirements relating to their duties sufficient to enable them to recognize potential problems and to know when to seek advice from the Company's Compliance Officer. Violations of laws, rules and regulations may subject the violator to individual criminal or civil liability, as well as to discipline and/or enforcement action by the Company. These violations may also subject the Company to civil or criminal liability or the loss of business.
>
> When dealing with customers, partners, and suppliers who may be publicly traded companies, compliance with United States securities laws is of utmost importance. The Company has adopted an Insider Trading and Disclosure Policy to help ensure compliance with these laws. Violations of this policy will be treated as violations of this Code.

54. Under the section titled "Conflicts of Interest," the Code of Conduct states, in relevant part:

An employee's personal activities and relationships must not conflict, or appear to conflict, with those of Rocket Lab. An employee's decisions and actions in the course of employment should be based on the best interests of Rocket Lab, not based on personal relationships or business and financial interests.

We expect each employee to evaluate personal relationships and activities to determine whether a conflict exists or could appear to exist and to avoid such relationships and activities. Common conflicts arise through the employment or business activities of a spouse, partner, significant other, or other relative or through personal or business relationships through which an employee or a spouse, partner, significant other, or relative may have a personal or economic relationship. Any situation where it may be difficult for an employee to perform work impartially, objectively, or effectively and in the best interests of Rocket Lab could suggest that a conflict exists. . . .

*Additional Conflict Provisions Relating to Non-Employee Directors*

Members of Rocket Lab's Board of Directors who are not also employees have special responsibilities to Rocket Lab but are also prominent individuals with substantial other responsibilities. Members of the Board will be required to disclose to other directors any personal, financial, business, or other economic interest they may have in any transaction submitted for approval by the Board and must recuse themselves from participating in any decision in which there exists a conflict of interest between their personal interests and the interests of Rocket Lab. Each

> non-employee director must promptly inform Rocket Lab if the director performs services as a director, employee, consultant, contractor, or agent for any customer, supplier, or other third party with whom Rocket Lab has a business relationship. No non-employee director may serve as a director, employee, consultant, contractor, or agent for any competitor of Rocket Lab.

55. Under the section titled, "Recordkeeping," the Code of Conduct states, in relevant part:

> All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the transactions and matters to which they relate and must conform both to applicable legal requirements and to the Company's system of internal controls. All assets of the Company must be carefully and properly accounted for. The making of false or misleading records or documentation is strictly prohibited. Unrecorded funds or assets should not be maintained. Please refer also to the more detailed requirements under Section I (Financial Records and Public Disclosure).

56. Under the section titled "Disclosure," the Code of Conduct states:

> The information in the Company's public communications, including filings with the Securities and Exchange Commission, must be full, fair, accurate, timely and understandable. All employees and directors are responsible for acting in furtherance of this policy. In particular, each employee and director is responsible for complying with the Company's

disclosure controls and procedures and internal controls for financial reporting. Any questions concerning the Company's disclosure controls and procedures and internal controls for financial reporting should be directed to the Company's Compliance Officer. Please refer also to the more detailed requirements under Section I (Financial Records and Public Disclosure).

Anyone that believes that questionable accounting or auditing conduct or practices have occurred or are occurring should refer to the Company's Audit Committee Complaint Procedures, which is available on Rocket Lab's intranet.

57. Under the section titled "Insider Trading," the Code of Conduct states:

The purpose of the Company's insider trading policy is to establish guidelines to ensure that all employees and directors comply with laws prohibiting insider trading. Employees and directors also may not trade in stocks of other companies about which they learn material, non-public information through the course of their employment or service with the Company.

Any questions as to whether information is material or has been adequately disclosed should be directed to the Company's Compliance Officer. Additional information regarding insider trading can be found in the Company's Insider Trading and Disclosure Policy.

## ROCKET LAB'S AUDIT COMMITTEE CHARTER

58. Pursuant to Rocket Lab's Audit Committee Charter, the general purposes of the Company's Audit Committee are to:

> (A) assist the Board of Directors (the "Board") in its oversight of (1) the integrity of the Company's financial statements, (2) the Company's compliance with legal and regulatory requirements, (3) the Company's accounting and financial reporting processes and the audits of the financial statements of the Company, and (4) the qualifications, independence and performance of the Company's independent auditors engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company (the "Independent Auditors"); and (B) prepare the report required by the rules of the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement.

59. In the section titled "Responsibilities and Authority," the Audit Committee charter tasks Rocket Lab's Audit Committee with the following responsibilities, among others:

> **A. Review of Charter.** The Audit Committee shall review and reassess the adequacy of this Charter annually and recommend to the Board any amendments or modifications it deems appropriate.
>
> **B. Matters Relating to Selection, Performance, and Independence of Independent Auditors.**

1. The Audit Committee shall be directly responsible for appointing, retaining and terminating, and for determining the compensation, of the Company's Independent Auditors. The Audit Committee may consult with management in fulfilling these duties, but may not delegate these responsibilities to management.

2. The Audit Committee shall be directly responsible for overseeing the work of the Independent Auditors (including resolving disagreements between management and the Independent Auditors regarding financial reporting). . . .

**C. Matters Related to the Internal Audit Function**

1. The Audit Committee will oversee and monitor the performance of the Company's Internal Audit function. The Internal Audit Department will have a direct reporting relationship to the Committee. With regards to operation matters, the Department will additionally report to the CFO.

2. The Committee will review internal audit plans for the upcoming year, review significant reports prepared by the Department, and meet directly with the lead internal auditor of the Company. The Committee will review and advise on the organizational structure of the Internal Audit function and on the selection and removal of the lead internal auditor.

**D. Audited Financial Statements and Annual Audit**

1. The Audit Committee shall have general responsibility for fulfilling the Board's oversight role with respect to (i) the Company's preparation and disclosure of its annual financial results and condition, including disclosures contained in earnings releases, supplemental financial disclosures or Annual Reports on Form 10-K, (ii) any internal audit function maintained by the Company and (iii) the audit of the Company's annual financial results and condition by the Independent Auditors.

2. The Audit Committee shall review and discuss with management (including the members of management who are responsible for preparing the Company's financial statements, including the Company's Chief Financial Officer and/or principal accounting officer or principal financial officer (the Chief Financial Officer and such other officer or officers are referred to collectively as the "Senior Accounting Executive")) and with the Independent Auditors the Company's annual audited financial statements, including all critical accounting policies and practices used or to be used by the Company. . . .

5. The Audit Committee shall review any reports made by the Chief Executive Officer and Chief Financial Officer of the Company to the Audit Committee with respect to (1) any significant deficiencies and material weaknesses in the design

or operation of internal control over financial reporting that are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act, within the time periods specified in the SEC's rules and forms, and (2) any fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting.

6. Based on the Audit Committee's review and discussions (1) with management of the audited financial statements, (2) with the Independent Auditors of the matters required to be discussed by the applicable requirements of the PCAOB and the SEC, and (3) with the Independent Auditors concerning the Independent Auditors' independence, the Audit Committee shall make a recommendation to the Board as to whether the Company's audited financial statements should be included in the Company's Annual Report on Form 10-K for the last fiscal year.

7. The Audit Committee shall prepare or oversee the Audit Committee report required by Item 407(d) of Regulation S-K of the Exchange Act (or any successor provision) to be included in the Company's annual proxy statement.

**E. Unaudited Quarterly Financial Statements**

1. The Audit Committee shall have general responsibility for fulfilling the Board's oversight role with respect to the Company's preparation and disclosure of its quarterly financial results and condition, including disclosures contained in earnings releases, supplemental financial disclosures or Quarterly Reports on Form 10-Q.

2. The Audit Committee shall review and discuss with management and the Independent Auditors, before the filing of the Company's Quarterly Reports on Form 10-Q, the Company's quarterly financial statements and any matters required to be discussed with management or the Independent Auditors by the applicable requirements of the PCAOB and the SEC.

**F. Risk Assessment and Management**

1. The Audit Committee shall discuss the guidelines and policies that govern the process by which the Company's exposure to risk is assessed and managed by management.

2. The Audit Committee shall periodically review the Company's enterprise risk management framework and major risk exposures, including the Company's enterprise risk management processes.

3. In connection with the Audit Committee's discussion of the Company's risk assessment and management guidelines, the Audit Committee may discuss or consider the Company's major risk exposures, including financial, operational, privacy, security, cybersecurity, competition, legal, regulatory and accounting risk exposures and the steps that the Company's management has taken to monitor and control such exposures. . . .

**H. Legal and Regulatory Compliance**

1. The Audit Committee shall have general responsibility for fulfilling the Board's oversight role with respect to the compliance of the Company and its subsidiaries with applicable legal and regulatory requirements.

**I. Related Person Transactions**

1. The Audit Committee shall be responsible for reviewing, considering and approving "related person transactions" pursuant to the Company's Corporate Governance Guidelines.

## SUBSTANTIVE ALLEGATIONS

***Background***

60. Headquartered in Long Beach, California, Rocket Lab is a purported end-to-end space company that delivers launch services, spacecraft design services,

spacecraft components, spacecraft manufacturing and other spacecraft and on-orbit management solutions that make it faster, easier and more affordable to access space.

61. According to the Company's annual report for 2024 filed on a Form 10-K with the SEC on February 27, 2025, as of December 31, 2024, Rocket Lab has delivered over 200 spacecraft to space across 54 successful orbital missions for commercial and government customers, including the United States Department of Defense, the National Aeronautics and Space Administration, the Defense Advanced Research Projects Agency, the National Reconnaissance Office, and a number of domestic and international commercial spacecraft operators.

62. In 2017, the Company launched Electron, a fully carbon composite launch vehicle powered by Rutherford, the Company's electric turbopump 3D print engines.

63. On March 1, 2021, the Company announced that it was launching its newest rocket, Neutron, an advanced eight-ton payload class launch vehicle tailored for mega-constellation deployment, interplanetary missions and human spaceflight. The Company highlighted Neutron, stating that it would "transform space access for satellite constellations and provide a dependable, high-flight-rate dedicated launch solution for larger commercial and government payloads."

64. In early 2024, the Company announced that it would conduct a test launch of Neutron in mid-2025 before offering three commercial launches in 2026 and five commercial launches in 2027. On November 12, 2024, Rocket Lab issued a press release announcing that the Company entered into a multi-launch agreement with a confidential commercial satellite constellation operator for Neutron and that the under the contract, Rocket Lab would launch two dedicated missions on Neutron starting in mid-2026.

***The Individual Defendants' False and Misleading Statements***

65. On November 12, 2024, the Company issued the 3Q24 Earnings

Release, wherein Defendant Beck was quoted as highlighting the Company's "[s]ignificant achievements for the quarter," which included Rocket Lab "signing a launch service agreement for multiple launches on Neutron with a confidential commercial satellite constellation customer." Specifically, Defendant Beck was quoted as stating:

> In the third quarter 2024 we once again executed against our end-to-end space strategy with successes and key achievements reached across small and medium launch, as well as space systems. Revenue grew 55% year-on-year to $105 million and we continue to see strong demand growth with our backlog at $1.05 billion. ***Significant achievements for the quarter included signing a launch service agreement for multiple launches on Neutron with a confidential commercial satellite constellation customer***; successfully launching twelve Electron launches year-to-date, making 2024 a record year for launches with more still to come; signing $55 million in new Electron launches, further cementing Electron's position as a global launch leader; and being selected by NASA to complete a study contract for a proposal to retrieve samples from Mars and return them to Earth as part of a world-first mission. We expect to close out the year strongly with more Electron launches scheduled in November and December, ***alongside continued progress across Neutron and space systems***, that is behind our guidance for a record $125-$135 million revenue quarter in Q4.

(Emphasis added).

66. The 3Q24 Earnings Release also included "Business Highlights for the Third Quarter 2024" for Neutron, which included, among others:

- Signed a launch service agreement for multiple launches on Neutron with a confidential commercial satellite constellation operator that signifies the beginning of a productive collaboration that could see Neutron deploy the entire constellation. . . .

- Significant progress made across Neutron's structures and infrastructure, including the completion of construction on the rocket's Assembly, Integration, and Test (A.I.T.) facility in Virginia.

67. The 3Q24 Earnings Release also highlighted the Company's financial results for the third quarter:

| | Three Months Ended September 30, 2024 | 2023 |
|---|---|---|
| Revenues | $ 104,808 | $ 67,661 |
| Cost of revenues | 76,812 | 52,694 |
| Gross profit | 27,996 | 14,967 |
| Operating expenses: | | |
| Research and development, net | 47,723 | 26,626 |
| Selling, general and administrative | 32,172 | 27,200 |
| Total operating expenses | 79,895 | 53,826 |
| Operating loss | (51,899) | (38,859) |
| Other income (expense): | | |
| Interest expense, net | (454) | (1,413) |
| Loss on foreign exchange | (490) | (120) |
| Other income, net | 1,848 | 1,176 |
| Total other income (expense), net | 904 | (357) |
| Loss before income taxes | (50,995) | (39,216) |
| Provision for income taxes | (944) | (1,352) |
| Net loss | $ (51,939) | $ (40,568) |
| Net loss per share attributable to Rocket Lab USA, Inc.: | | |
| Basic and diluted | $ (0.10) | $ (0.08) |
| Weighted-average common shares outstanding: | | |
| Basic and diluted | 497,701,715 | 484,034,071 |

68. On the same day, the Company filed its quarterly report for the period ended September 30, 2024, on a Form 10-Q with the SEC (the "3Q24 10-Q"). Under a section titled "Neutron Update," the 3Q24 10-Q stated that:

> We have made significant progress across Neutron's structures and infrastructure, including the completion of construction on the rocket's Assembly, Integration, and Test (A.I.T.) facility in Virginia. We have doubled engine testing cadence for Archimedes over the quarter at Rocket Lab's engine test site in Mississippi, alongside strong production execution at our Engine Development Complex in California which included multiple engines manufactured, assembled, and shipped for engine testing. We signed a launch service agreement for two dedicated Neutron launches with a confidential commercial satellite constellation customer.

69. The Company also touted its "Launch Vehicle Build-Rate and Launch Cadence" in the 3Q24 10-Q, stating:

> We built approximately eight launch vehicles 2021, approximately 12 launch vehicles in 2022 and approximately 11 launch vehicles in 2023. We built approximately 10 launch vehicles through the nine months ended September 30, 2024. We launched six vehicles in 2021, nine vehicles in 2022 and ten vehicles in 2023. We have launched 11 vehicles through the nine months ended September 30, 2024 and launched 12 vehicles through November 12, 2024. Growth rates between launches and total launch service revenue are not perfectly correlated because our total revenue is affected by other variables, such as the revenue per launch, which can vary considerably based on factors such as unique orbit and insertion requirements, payload handling needs, launch location, time sensitivity of mission completion and other factors. We believe that the growth in our build rate and launch rate is a positive

indicator of our ability to scale our launch operations.

70. The 3Q24 10-Q also highlighted the Company's revenue growth for the third quarter, stating:

> *Three Months Ended September 30, 2024 and 2023*
>
> We generated $104.8 million and $67.7 million in revenue for the three months ended September 30, 2024 and 2023, respectively, representing a year-on-year increase in revenue of approximately 55%. This year-on-year increase primarily resulted from space systems revenue growth of $37.5 million, offset by a decrease in launch revenue of $0.4 million due to a lower revenue per launch.

71. Additionally, the 3Q24 10-Q included the same table of financial results as the 3Q24 Earnings Release (*see supra* ¶ 67), excluding the "Net loss per share attributable to Rocket Lab USA, Inc." and "Weighted-average common shares outstanding" metrics.

72. The 3Q24 10-Q was signed by Defendants Beck and Spice. The 3Q24 10-Q was also accompanied by certifications made by Defendants Beck and Spice pursuant to Rules 13a-14(a) and 15(d)-14(a) of the Exchange Act and Section 302 of the Sarbanes-Oxley Act of 2002 (the "SOX Certifications"), wherein Beck and Spice attested to the accuracy of the 3Q24 10-Q.

73. Also on November 12, 2024, the Company hosted an earnings call for investors and analysts to discuss its financial results for the third quarter of 2024 (the "3Q24 Earnings Call"). During the 3Q24 Earnings Call, Defendant Spice reiterated that the Neutron launch would be happening mid-2025, stating, in relevant part:

> [W]e do expect to pick up in cash consumption in the next few quarters, owing to ***an increased expected increase in Neutron spending ahead of our mid-2025 launch*** and lumpiness in large space systems milestone payment collections.

(Emphasis added).

74. Moreover, during the 3Q24 Earnings Call, Defendant Beck, in response to an analyst question regarding whether "[t]he target for the first launch [of Neutron] is unchanged for mid-2025," stated, in relevant part: "I think you know we've been pretty clear about what to expect for Neutron's launch cadence to be. So obviously, one test flight in the following year, three and then five and then seven, and beyond."

75. The statements detailed above were materially false and misleading when made because they failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (i) the initial plans for the Neutron's barge landing tests were substantially delayed; (ii) preparation of the launch pad was delayed due to a myriad of issues, including the potable water issue on the island that would not be resolved until early 2026; (iii) due to these issues, it was highly unlikely that the Neutron rocket would launch in mid-2025 as expected; (iv) Rocket Lab's sole contract for the Neutron launch was not as lucrative as the Company led investors to believe; and (v) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

***The Truth Emerges***

76. The truth was revealed on February 25, 2025, when the Bleecker Street Report was published claiming, among other things, that Rocket Lab "has materially misled investors about the likelihood that its Neutron rocket will launch in mid-

2025."

77. The Bleecker Street Report also revealed a series of other ways that the Company misled investors regarding the launch of Neutron. The Bleecker Street Report began by stating:

> Rocket Lab (RKLB) is a rocket development and space systems company that has seen shares rise 485% over the last year to a $11.2 billion valuation, propelled by investor and analyst excitement over the upcoming launch of Neutron, a medium-lift rocket that RKLB hopes will compete with SpaceX's Falcon 9.
>
> We believe that RKLB has materially misled investors about the likelihood that its Neutron rocket will launch in mid-2025, a timeline the company has repeatedly claimed in media interviews and on earnings calls. In fact, rocket experts we spoke to put the timeline of a rocket launch from mid-2026 to mid-2027, a one to two year delay.
>
> Many aspects of RKLB's Neutron program remain far behind where they need to be: from engine development, to engine and structure production, to launch pad construction, to rocket transport to the launch site, per documents we reviewed and 23 interviews with industry experts, including former Rocket Lab engineers and executives.
>
> With a 2026 or 2027 Neutron launch, it appears RKLB won't be able to onboard for a year or more to its most lucrative single source of potential contracts, National Security Space Launch's (NSSL's) Phase 3 Lane 1 program.

> At the same time, Neutron's sole announced launch contract looks to be with an unproven, questionably capitalized startup called E-Space, which two experts called a subpar customer that may run out of money or pull the launch entirely.

78. The Bleecker Street Report went on to reveal that the three barge landing tests for the Neutron, which were originally scheduled to take place between September 2024 and March 2025, had been rescheduled until September 2025 through March 2026, stating, in relevant part:

> **Rocket Transportation Delays Put a Launch in 2026 at Best**
>
> As part of our investigation, Bleecker Street reviewed thousands of pages of technical documents and permitting information at the local, state, and federal levels. In this review, a clear picture emerges that Rocket Lab will not be able to launch in 2025.
>
> Below are the steps still necessary to launch Neutron in 2025, per Rocket Lab's website. Experts we spoke to said that together, these milestones, which include structural qualification, engine qualification, vehicle integration, and wet dress rehearsal, will require 12-18 months from today to accomplish even in the absence of catastrophic setbacks. The 2025 timeline appears entirely unworkable, and 2026 is also in doubt. . . .
>
> Rocket Lab's launch facility is in Wallops, Virginia, a NASA site that

also hosts Electron launches at a separate pad. Because of Neutron's size, which is much bigger than anything currently launching from Wallops, there has been a lengthy and complex planning process about how to transport the large Neutron rocket components from where they are being constructed outside Baltimore. Complicating the back-and-forth is the fact that there is no permanent dock infrastructure on Wallops Island itself. While NASA's Spaceport management team has a long-term plan to build a dock at Wallops, that is a 2027 and beyond plan currently. In our review, we noticed things move slowly at Wallops, with one bridge replacement taking 3 years to complete, for example.

Initially, Rocket Lab and NASA staff had settled on a direct beach landing of a barge from Baltimore. The sand dunes on the barrier would have to be flattened with earth movers, and a temporary platform erected to carry the massive rocket stages from the barge into the facility by mobile cranes. This plan had been formalized as a temporary solution in late 2023, and NASA applied for a permit from the Virginia Marine Resource Commission (VMRC) in July 2024. The permit application indicated that the three landings needed for an initial launch would occur between 1 September 2024 and 14 March 2025:

**Part 1 - General Information: Question 4. Detailed Description of the Project:**

This project is on the Wallops Island Flight Facility (Appendix B - Graphic 1-1 and 1-2). This JPA is requesting authorization for three (3) barge landing test events onto Wallops Island beach within an area NASA has proposed for these tests south of the Launch Pad O-B at the southern breakwater within the potential barge landing location (Appendix B - Graphic 1-6). The project would temporarily impact the beach area. The barge landing would occur within this location area which allows for minor adjustments in the actual landing location if in-water obstructions are identified. These three test events would occur between September 1, 2024, and March 14, 2025.

. . . .

NASA and Rocket Lab initially viewed a beach landing as the sole path for rocket delivery, since other infrastructure like a new bridge would require 1-2 years of additional analysis under the National Environmental Policy Act (NEPA) before construction could even begin.

However, timelines only deteriorated from there. Whereas in July, a September 2024 - March 2025 window was proposed, by October 2024, these plans had changed. An October 15 document submission to NOAA for compliance with Essential Fish Habitat (EFH) assessments showed that Rocket Lab and NASA had opened a new window for landings, now moved back an entire year and starting in September 2025:

UNITED STATES DEPARTMENT OF COMMERCE
National Oceanic and Atmospheric Administration
NATIONAL MARINE FISHERIES SERVICE
GREATER ATLANTIC REGIONAL FISHERIES OFFICE
55 Great Republic Drive
Gloucester, MA 01930

October 17, 2024

Lori Levine
WFF Natural Resources Manager
U.S. National Aeronautics and Space Administration
Wallops Flight Facility
Wallops Island, VA 23337

RE: Essential Fish Habitat Consultation, Wallops Flight Facility Barge Beach Test Landing

Dear Ms. Levine:

We have reviewed the October 15, 2024, essential fish habitat assessment (EFH) worksheet submitted for National Aeronautics and Space Administration's (NASA) proposal to conduct three barge landing test events on the Wallops Island beach within NASA's Wallops Flight Facility (WFF)south of the Launch Pad 0-B at the southern breakwater. The purpose of the project is to perform test events to assess the Neutron rocket parts delivery, rocket construction, and to prepare for the rocket launches from the Mid-Atlantic Regional Spaceport (MARS) on the eastern coast of Virginia from the WFF. The three test events would occur between fall of 2024 and March 14, 2025 or September 1, 2025, and March 14, 2026.

> Conversations we've had with aerospace industry experts, including NASA program specialists, indicate that assembly, integration, and testing of a rocket would require a minimum of several months from delivery.

79. Additionally, the Bleecker Street Report revealed that development of the launch pad was significantly delayed, stating:

> **Wallops Launch Pad Is Behind Schedule, Alternate Transportation Options Won't Help Delay**
>
> While Rocket Lab shows pictures of development on the Wallops launch pad, experts told us the pad looked many months away from being complete. We found local filings corroborate this, and also imply Neutron can't launch before 2026. . . .
>
> The space and rocket infrastructure at Wallops, officially named the Mid Atlantic Regional Spaceport (MARS), is supported by NASA, but the funding and contract management runs through the State of Virginia-managed Virginia Spaceport Authority. This unique arrangement forces all work at the facility to be managed in compliance with Virginia State appropriation and funding law.
>
> In particular, construction at the launch pad can be tracked via Virginia's Procurement system (https://eva.virginia.gov/). We have been following progress at MARS for hints about where Rocket Lab stands on this front, and our research shows that numerous projects required for Rocket Lab

to begin Neutron operations are well behind schedule. In fact, the entire island has a potable water problem that won't get fixed until early 2026. Potable water is a requirement for launch.

Recent inspections of the Wallops utility water system in connection with a bridge widening project show a "catastrophic deterioration" of the water supply. This problem will not be fixed until January 2, 2026:

> The specific purpose of the project is to allow NASA, its tenants, and customers to continue transporting personnel, mission hardware, and equipment via roadway and bridge to Wallops Island once the existing Causeway Bridge is decommissioned at the end of its service life, as well as to replace several utility lines providing electric, water, and sewer services to Wallops Island that are currently attached to the existing Causeway Bridge. The utilities need to be replaced and relocated to continue uninterrupted service to Wallops Island. Additionally, recent inspections of the water utility infrastructure showed catastrophic deterioration of the potable water supply to Wallops Island, which require imminent attention. If the existing utilities are not replaced, Wallops Island would not receive potable water due to the deterioration of the utility lines. This would pose a major safety concern as potable water is used not only for drinking but also for building fire suppression systems and heat and acoustic vibration deluge during rocket launches.
>
> **19.0 BRIDGE CONSTRUCTION AND UTILITY RELOCATION SCHEDULE**
>
> Bridge construction will take place from February 12th, 2025, to August 11th, 2027.
>
> Roadway construction will take place from January 25th, 2025, to December 7th, 2027.
>
> Utility relocations will take place from September 3rd, 2025, to January 2nd, 2026.
>
> Fender/dolphin systems will be installed from July 1st, 2027, to August 13th, 2027.
>
> Oyster relocation will take place in March 2024.
>
> Existing bridge demolition will take place from December 29th, 2027, to August 30th, 2028.

One NASA range engineer currently stationed at Kennedy Space Center told us that the availability of water was mission critical for deluge suppression systems and that its availability would dictate not only launches, but forms a prerequisite for construction of the final portion of the Neutron pad itself. . . .

> We confirmed that the critical issues in the potable water system were well known prior to Rocket Lab's November earnings call. Certified plans for the reconstruction of potable water lines were dated the first week of November 2024. As with the rocket transportation setbacks, Rocket Lab did not address any of these issues to investors, instead remarking airily that on the regulatory front, "there's nothing that's kind of out of bed at the moment."

80. The Bleecker Street Report also reported that the contract Rocket Lab entered into with the "confidential commercial satellite constellation operator" was not as lucrative as the Company led investors to believe, stating, in relevant part:

> **Rocket Lab Appears to Have Misled About Neutron Launch Contract Pricing; We Believe its Unnamed Customer is E-Space, A Startup with Questionable Ability to Pay For and Deliver a Constellation to the Pad**. . . .
>
> We believe that Rocket Lab's first and so far only Neutron contract is not a full-price deal, contrary to what Rocket Lab's has said, and the unnamed customer is an unreliable startup named E-Space. In November 2024, Rocket Lab announced it had signed a two-launch contract with a "confidential commercial satellite constellation operator" slated for mid-2026.
>
> On the Q3 2024 earnings call that month, Peter Beck insisted that the contract was "in line" with standard Neutron pricing of $50-$55 million:

**Analyst:** *"And then you stated that the ASPs, you're going to be pretty firm on pricing. Is that the $50 million to $55 million that you initially talked about, and that's sort of where things have settled maybe for these 2 dedicated missions?*

**Peter Beck:** *"Yes. I mean the launch pricing, as we pointed out, is -- that was a really important thing for us. And I think as I've said, I made -- well, I kind of had to, but with Electron, it took us years to flush out bad contracts with respect to ASP. So no,* ***this contract is in line with our previously discussed ASP for Neutron****."*

However, it is unheard of for a launch vehicle with no reliability track record to charge full-freight pricing, so this statement appears to be a lie or at best, a misdirection. Industry experts, including former Rocket Lab employees, were skeptical of the value of the contract and the wording used to describe it, and they suspected that Rocket Lab was discounting the contract significantly:

"*It would be pretty typical to be flying the first few flights at a discount, because as a customer you're taking so much risk on something that hasn't been proven yet... If you're a commercial customer and you're spending $40 or $50 million, you're going to go with the most reliable vehicle unless you were offered a significant discount.*"

–Former Senior RKLB Engineer. . . .

The background of the mystery customer lines up with someone willing

to accept a deeply discounted flight on a rocket with no track record. We believe it is a startup called E-Space, run by entrepreneur Greg Wyler, who has a colorful and promotional history. We arrive at that conclusion in the following way: last November, Electron launched a satellite, Protosat-1, for a confidential customer. E-Space, for its part, had received clearance to send a payload to New Zealand in September (permit 2425-0903). September is just after RKLB's confidential customer would have signed the launch contract, which carried a tight two-month turnaround from agreement to launch. As a final clue, Protosat-1 was registered under the flag of Rwanda, to which E-Space and Wyler have business ties.

A person we spoke to with knowledge of the industry agreed with our assessment. . . .

We believe E-Space is a lot more bluff than substance when it comes to actually getting things done. Wyler is a serial entrepreneur who founded the constellation OneWeb but left in 2017, before it had launched a single satellite; OneWeb went bankrupt in 2020. There is an odd information vacuum surrounding E-Space: there isn't even a coherent description of their service on their website, which is laden with buzzwords. Where Wyler has made public pronouncements about E-Space, they have tended to be extreme, claiming that E-Space would put 100,000 or 327,000 satellites in orbit, making them by far the largest constellation in the world. Several senior executives and a board member have all churned out of the young company, while the satellite network is still unlaunched despite promises to hit mass production in 2023. There are only two

> recorded rounds of funding for E-Space since founding. At its core, E-Space appears to be a promotional and self-enrichment vehicle for Wyler.
>
> . . .
>
> To the extent Neutron's sole existing launch customer can't pay or walks away from the launch, that will further hurt cash flow in an already cash-constrained business. For all the foregoing reasons, It appears that Rocket Lab's cash flow needs are going to be extreme as a result of delays and profitability challenges with Neutron.

81. Following the revelations in the Bleecker Street Report, Rocket Lab's stock price fell $2.21 per share, or nearly 10%, from a closing price of $22.49 per share on February 24, 2025, to a closing price of $20.28 per share on February 25, 2025.

***Insider Sales***

82. During the Relevant Period, while in possession of non-public information concerning the Company's financial condition and business prospects, Defendants Spice, Armagno, Olson, Saintil, and Slusky made improper sales of Rocket Lab's common stock, netting total proceeds of approximately $6.4 million.

83. While the Company's stock price was artificially inflated, Defendant Spice sold approximately 62,511 shares of Rocket Lab common stock, totaling proceeds of over $1.5 million. Defendant Spice made the following sales of Rocket Lab stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| November 25, 2024 | 62,511 | $24.15 | $1,509,640.65 |

84. While the Company's stock price was artificially inflated, Defendant Armagno sold approximately 10,000 shares of Rocket Lab common stock, totaling proceeds of over $230,000. Defendant Armagno made the following sales of Rocket Lab stock during the Relevant Period:

| **Transaction Date** | **Number of Shares Sold** | **Average Price Per Share** | **Total Transaction** |
|---|---|---|---|
| December 11, 2024 | 10,000 | $23.63 | $236,300 |

85. While the Company's stock price was artificially inflated, Defendant Olson sold approximately 50,000 shares of Rocket Lab common stock, totaling proceeds of over $1 million. Defendant Olson made the following sales of Rocket Lab stock during the Relevant Period:

| **Transaction Date** | **Number of Shares Sold** | **Average Price Per Share** | **Total Transaction** |
|---|---|---|---|
| November 19, 2024 | 50,000 | $20.69 | $1,034,315 |

86. While the Company's stock price was artificially inflated, Defendant Saintil sold approximately 50,000 shares of Rocket Lab common stock, totaling proceeds of over $1.2 million. Defendant Saintil made the following sales of Rocket Lab stock during the Relevant Period:

| **Transaction Date** | **Number of Shares Sold** | **Average Price Per Share** | **Total Transaction** |
|---|---|---|---|
| November 26, 2024 | 50,000 | $25.55 | $1,277,500 |

87. While the Company's stock price was artificially inflated, Defendant Slusky sold approximately 100,000 shares of Rocket Lab common stock, totaling proceeds of over $2.3 million. Defendant Slusky made the following sales of Rocket Lab stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| December 2, 2024 | 50,000 | $24.28 | $1,214,000 |
| December 3, 2024 | 50,000 | $23.00 | $1,150,000 |

88. As a result of these insider sales, Defendants Spice, Armagno, Olson, Saintil, and Slusky were unjustly enriched.

***Harm to the Company***

89. As a direct and proximate result of the Individual Defendants' misconduct, Rocket Lab has lost and expended, and will lose and expend, millions of dollars.

90. Such expenditures include, but are not limited to, the legal fees associated with the Securities Class Action filed against the Company and Defendants Beck and Spice, and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

91. Such expenditures also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

92. Furthermore, the Securities Class Action has exposed the Company to massive class-wide liability.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

93. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breach of fiduciary duties by the Individual Defendants.

94. Rocket Lab is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

95. Plaintiff is a current shareholder of Rocket Lab and was a continuous shareholder of the Company during the period of the Individual Defendants'

wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

96. A pre-suit demand on the Board of Rocket Lab is futile and, therefore, excused. At the time this action was commenced, the eight-member Board was comprised of Defendants Beck, Armagno, Frank, Ocko, Olson, Possenriede, Saintil, and Slusky (the "Director Defendants"). Accordingly, Plaintiff is only required to show that four Director Defendants cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

97. The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

98. Additionally, each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

99. Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

100. Defendant Beck is not disinterested or independent and is therefore

incapable of considering a demand. Beck is the founder, CEO and President of the Company and serves as Chair of the Board. Thus, as conceded by Rocket Lab in its annual proxy statement filed with the SEC on April 24, 2024, the Company admits that Beck is a non-independent director. Furthermore, Defendant Beck is named as a defendant, and therefore faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

101. Additionally, each of the Director Defendants received payments, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company. Furthermore, Defendants Armagno, Olson, Saintil, and Slusky each made insider sales of the Company's common stock while the price was artificially inflated as a result of the materially false and misleading statements alleged herein.

102. All of the Board's current members derive substantial revenue from the Company, control the Company, and are indebted to each other and the Company. These conflicts of interest have precluded the Board's current members from calling into question the Director Defendants' conduct.

103. Moreover, none of the Director Defendants have taken remedial action to redress the conduct alleged herein.

104. Defendants Olson, Frank, and Possenriede served on the Company's Audit Committee during the Relevant Period (the "Audit Defendants") and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial accounting and reporting, the underlying internal controls and procedures over financial reporting, and the audits of the financial statements. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material

misstatements and omissions regarding the Company's business and the adequacy of its internal controls as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

105. The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Directors to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

106. Accordingly, a pre-suit demand upon the Board is futile and excused.

## COUNT I

### Against the Individual Defendants

### For Breach of Fiduciary Duty

107. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

108. The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

109. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

110. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual

Defendants breached their fiduciary duties of loyalty and good faith by failing to implement and monitor adequate internal controls over the Company's financial reporting and, as a consequence, issuing or permitting the issuance of materially false and misleading statements in the Company's SEC filings and other public disclosures. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

111. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia,* that: (i) the initial plans for the Neutron's barge landing tests were substantially delayed; (ii) preparation of the launch pad was delayed due to a myriad of issues, including the potable water issue on the island that would not be resolved until early 2026; (iii) due to these issues, it was highly unlikely that the Neutron rocket would launch in mid-2025 as expected; (iv) Rocket Lab's sole contract for the Neutron launch was not as lucrative as the Company led investors to believe; and (v) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

112. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

113. Furthermore, five of the Individual Defendants engaged in insider sales during the Relevant Period while the price of the stock was artificially inflated, netting millions of dollars in proceeds for themselves.

114. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to

maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

115. As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

116. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

117. Plaintiff, on behalf of Rocket Lab, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

118. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

119. By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

120. Plaintiff, on behalf of Rocket Lab, has no adequate remedy at law.

**COUNT III**

**Against the Individual Defendants**

**For Unjust Enrichment**

121. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

122. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Rocket Lab.

123. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Rocket Lab that were tied to the performance or artificially inflated valuation of Rocket Lab, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

124. Moreover, five of the Individual Defendants engaged in insider sales during the Relevant Period while the price of the stock was artificially inflated, netting millions of dollars in proceeds for themselves

125. Plaintiff, as a shareholder and a representative of Rocket Lab, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

126. Plaintiff, on behalf of Rocket Lab, has no adequate remedy at law.

**COUNT IV**

**Against the Individual Defendants**

**For Abuse of Control**

127. Plaintiff incorporates by reference and realleges each and every

allegation contained above, as though fully set forth herein.

128. The Individual Defendants misconduct alleged herein constituted an abuse of their control over the Company, for which they are legally liable.

129. As a direct and proximate cause of the Individual Defendants' abuse of control, the Company has sustained substantial damages.

130. Plaintiff, on behalf of Rocket Lab, has no adequate remedy at law.

**COUNT V**

**Against the Individual Defendants**

**For Waste of Corporate Assets**

131. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

132. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

133. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Class Action.

134. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

135. Plaintiff, on behalf Rocket Lab, has no adequate remedy at law.

**COUNT VI**

**Against Defendants Beck and Spice for Contribution Under Sections 10(b) and 21D of the Exchange Act**

136. Plaintiff incorporates by reference and realleges each and every

allegation contained above, as though fully set forth herein.

137. Rocket Lab and Defendants Beck and Spice are named as defendants in the Securities Class Actions, which assert claims under federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder by the SEC. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole, or in part, due to Defendants Beck's and Spice's willful and/or reckless violations of their obligations as officers and/or directors of Rocket Lab.

138. Defendants Beck and Spice because of their positions of control and authority as officers and/or directors of Rocket Lab, were able to, and did, directly and/or indirectly, exercise control over the business and corporate affairs of Rocket Lab, including the wrongful acts complained of herein and in the Securities Class Actions.

139. Accordingly, Defendants Beck and Spice are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

140. As such, Rocket Lab is entitled to receive all appropriate contribution or indemnification from Defendants Beck and Spice.

141. Plaintiff, on behalf Rocket Lab, has no adequate remedy at law

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A. Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B. Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C. Awarding punitive damages;

D. Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: April 16, 2025

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By: */s/ Alex J. Tramontano*
ALEX J. TRAMONTANO

Betsy C. Manifold
Rachele R. Byrd
Alex J. Tramontano
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
Email: manifold@whafh.com
Email: byrd@whafh.com
Email: tramontano@whafh.com

**RIGRODSKY LAW, P.A.**
Vincent A. Licata
Leah B. Wihtelin
825 East Gate Boulevard, Suite 300
Garden City, NY 11530

Telephone: (516) 683-3516
Email: vl@rl-legal.com
Email: lw@rl-legal.com

**GRABAR LAW OFFICE**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
Email: jgrabar@grabarlaw.com

*Attorneys for Plaintiff*

**VERIFICATION**

I, Mohammed Abbas, have reviewed the allegations made in this Verified Stockholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of Rocket Lab USA, Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: 4/15/2025

Signed by:
AAAF457EE7A84F6...
MOHAMMED ABBAS